UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

IEMA D. LEMONS,

        Plaintiff,

        v.                              Case No.  13-C-0331

CITY OF MILWAUKEE, EDWARD FLYNN,
NANETTE HEGERTY, LADMARALD CATES,
and ALVIN HANNAH,

        Defendants.

DECISION AND ORDER GRANTING IN PART AND DENYING IN PART
MOTION FOR SUMMARY JUDGMENT (DOC. 116) AND SETTING HEARING

Iema Lemons sues the City of Milwaukee, two of its chiefs of police, former-officer Ladmarald Cates, and Cates's former partner, Officer Alvin Hannah.  Lemons's claims stem from Cates's rape of Lemons when responding to Lemons's 9-1-1 call for police assistance.  Although the City does not admit for purposes of this case that a rape occurred, Cates was convicted of violating Lemons's civil rights by raping her; he is serving time in federal prison as a result.

The City defendants[1] move for summary judgment on the claims against them.  In response, Lemons has dropped certain claims.  However, she maintains claims against Cates and Hannah under the due process clause and the Fourth Amendment, her individual capacity claims against Flynn and Hegerty for insufficient investigation and supervision and discipline of Cates, and a *Monell* claim against the City.  Moreover, Lemons seeks indemnification by the City for Cates's liability.

---

[1]Cates represents himself, while the City's attorney represents all other defendants.  References to "the City defendants" indicate all defendants other than Cates.

Summary judgment is proper if the depositions, documents or electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials show that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of its cause of action, showing that there is a genuine issue for trial. *Id.* at 322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. To establish that a question of fact is "genuine," the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in its favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249.

## STATEMENT OF FACTS

A. Preliminary objections

Civil Local Rule 56(b) regarding summary judgment motions requires the parties to provide stipulations and/or proposed statements of fact and responses. Any proposed

2

statement that is not controverted is taken as true for summary judgment purposes.  Civil L.R. 56(b)(4).

The court notes that Lemons objects to many of the City defendants' proposed statements of fact because they are based on "self-serving" affidavits on subject matter that was explored at deposition.  (Doc. 137 at 1.)  According to Lemons, depositions are more reliable than affidavits and a party should not be allowed to "patch up" a deposition with a subsequent affidavit.  (*Id.* (citing *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67 (7th Cir. 1995).)  However, as stated by the Seventh Circuit more recently, the argument against affidavits as "self-serving" should be exterminated, as almost all affidavits are self-serving (otherwise why would they be submitted at all?).  *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 459-60 & n.1 (7th Cir. 2014) (reminding district courts to rid opinions of language critical of the "self-serving affidavit" and indicating that an affidavit based on personal knowledge and meeting the usual requirements for evidence presented on summary judgment is acceptable) *cert. denied,* 135 S. Ct. 2892 (2015); *Hill v. Tangherlini*, 724 F.3d 965, 967 & n.1 (7th Cir. 2013) (overruling cases that suggest a plaintiff may not rely on "self-serving" evidence).  An issue with an affidavit post-dating a deposition occurs when the affidavit *contradicts* the prior deposition testimony.  In that case the court disregards the "sham" affidavit unless the earlier testimony was ambiguous, confusing, or the result of a memory lapse.  *Cook v. O'Neill*, 803 F.3d 296, 298 (7th Cir. 2015).  That is the point in *Russell*.  *See* 51 F.3d at 67-68 ("Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the

3

discrepancy."). But an affidavit that amplifies rather than contradicts prior deposition testimony is not a sham affidavit and is perfectly acceptable for purposes of summary judgment if it meets the usual requirements. *See Cook*, 803 F.3d at 298. A party should not be prevented from submitting affidavit evidence just because the opposing party did not cover all of the pertinent facts at deposition, even if the subject matter was explored generally.

Here, Lemons does not point to specific contradictions between deposition testimony and subsequent affidavits, but to now-rejected language about "self-serving" affidavits and a purported preference for deposition testimony over affidavit evidence. However, because affidavits supplementing or amplifying deposition testimony are acceptable, her objection is overruled.

The City defendants object to all of Lemons's statements of additional proposed fact (Doc. 140) based on the number submitted. Lemons was granted leave to file 129 factual statements, exceeding the 100 permitted by Civil L.R. 56(b)(2)(B)(ii). However, in light of an apparent misnumbering of paragraphs (duplicating numbers 123 through 126), Lemons filed a total of 133 numbered paragraphs. Moreover, assert the City defendants, many of the paragraphs contain multiple factual statements in one paragraph—paragraphs 22 and 26, for example, set forth at least three separate factual propositions.

This objection, too, is overruled. The extra four paragraphs appear to have been the result of an error and are not an egregious infraction. And the local rules are enforced at the court's discretion. *See* Civil L.R. 1. Striking the entire document would be an excessive sanction, and the court, with due regard for the circumstance, will consider rather than strike Lemons's last four findings. As for the multiple factual statements in one

4

paragraph, the local rule, some years ago, limited each numbered paragraph to one factual statement. A subsequent revision removed that limitation. Now, the local rule requires that statements of facts "consist of short numbered paragraphs," without defining what "short" means. Civil L.R. 56(b)(1)(C)(I), (2)(B)(ii). In this instance, for expedience the court will consider all of Lemons's proposed statements rather than analyze each for whether it should be considered "short." The court sets no rule for the future regarding what length of statement will comport with the local rules.

Next, the City defendants object to any proposed statements of fact that are supported by the report or declaration of plaintiff's expert, Lou Reiter. They urge the court to disregard such proposed facts because Reiter's assertions are conclusory and bereft of facts to support them. According to the City defendants, an expert must do more than supply a bottom line and must show a process of reasoning on a firm foundation. (*See* Doc. 163 at 2–3.)

This argument presents a *Daubert*[2]-type challenge appropriate for a motion in limine rather than an objection in response to proposed statements of fact. Therefore, the court will not disregard Reiter's evidence as a whole. Moreover, reliance on Reiter's evidence is not required for purposes of this decision. The court comes to the same conclusion whether or not Reiter's offerings are considered.

To the extent that the City defendants object to citations to newspaper articles that are hearsay, the objection will be considered relating to specific proposed findings and sustained generally.

––––––––––––––––––––

[2]*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

5

B.    Facts

The following are undisputed or taken in the light favorable to Lemons.

1.    Police training, policies, policymakers, and discipline

All Milwaukee Police Department (MPD) officers complete an intensive police recruit course at the Milwaukee Fire and Police Training Academy. (Doc. 117, ¶ 11.[3]) Academy staff train officers regarding appropriate on-duty behavior and conducting investigations. (Doc. 117, ¶ 9; Doc. 137, ¶ 9.) After successful completion of recruit training at the academy, officers are assigned to a district police station, where field training officers are assigned to work with the new officers. (Doc. 117, ¶ 12.) New officers receive on-the-job training regarding MPD standard operating procedures (SOPs), policies, and various techniques used by officers. (Doc. 117, ¶ 13.) MPD officers are trained that sexual assault is a crime under Wisconsin law. (Doc. 117, ¶ 21; Doc. 137, ¶ 21.)

Ladmarald Cates completed the application process for the police-officer position successfully and was appointed as a Milwaukee police officer in November 1997. (Doc. 117, ¶ 8.) Cates attended the MPD academy for six months after he was hired by the MPD, and was taught basic rules and procedures of the law. (Doc. 117, ¶ 157.)

Arthur Jones was MPD Chief of Police from 1996 until 2003. Nanette Hegerty succeeded Jones as MPD Chief of Police from November 2003 through November 2007. (Doc. 140, ¶ 15.) Edward Flynn was sworn into the office of MPD Chief of Police on January 7, 2008, and holds that position today. (Doc. 140, ¶ 15.) Flynn, as chief, is

---

[3]Unless otherwise noted by citation to a responsive paragraph, the opposing party admitted or stipulated to the proposed statement of fact.

6

responsible for the leadership, performance, efficiency, and general good conduct of the MPD. (Doc. 117, ¶ 31.)

The MPD, through Flynn, has established policies and procedures relating to a code of conduct for its officers and officer discipline, including suspensions. (Doc. 117, ¶¶ 23, 24.) Established polices and SOPs include how to conduct patrol investigations and the expected professional behavior of officers who engage in police work. (Doc. 117, ¶ 19; Doc. 137, ¶ 19.)

The MPD has never had a specific policy regarding sexual misconduct while on duty. (Doc. 139 Ex. 11 at 58.) The MPD does not have a rule or policy incorporating the term "sexual misconduct" or addressing or singling out sexual misconduct expressly; neither Hegerty nor Flynn enacted such a specific rule. (*See* Doc. 140, ¶¶ 25, 27; Doc. 163, ¶¶ 25, 27; Doc. 139 Ex. 11 at 58 ("We haven't singled out sexual conduct from any other form of criminal conduct.").) The MPD does have a rule prohibiting "idling and loafing," aimed to ensure that officers conduct only police business while on duty. Flynn described the rule as "cover[ing] a multiple multitude of sins from the sublime to the ridiculous, from being asleep to theoretically committing a crime." (Doc. 140, ¶ 25; Doc. 163, ¶ 25; Doc. 139 Ex. 11 at 58.) Sexual activity on duty is arguably covered by the no-idling-and-loafing rule. (Doc. 137 ¶ 20.[4]) In addition, MPD has a rule that officers cannot violate any law or statute. (Doc. 140, ¶ 25; Doc. 163, ¶ 24; Doc. 139 Ex. 11 at 56.) An

---

[4]Lemons's expert opines that "MPD's failure to have a specific policy that prohibits its officers from engaging in sexual misconduct – and particularly, the use of an officer's authority and status as law enforcement to sexually exploit a civilian either verbally or physically – is a significant deviation from accepted national policing practices." (Doc. 140, ¶ 28; Doc. 139 Ex. 17, ¶ 31.)

7

officer's sexual contact with a person in custody or obtaining a sexual act in exchange for a promise of favorable treatment constitutes a felony in Wisconsin. (Doc. 140, ¶ 45.)

Formal discipline may be imposed to punish MPD-employee behavior or to deter future behavior that violates the SOPs, rules, regulations, or code of conduct. (Doc. 117, ¶ 27.) The types of discipline for an MPD officer include district-level reprimand, official reprimand, suspension without pay, demotion, and termination. (Doc. 117, ¶ 28.)

At all relevant times, the chief of police was the MPD policymaker regarding the investigation, supervision, and discipline of police officers, including the operations of MPD's Internal Affairs Division (IAD[5]) and the decision whether to impose discipline on an officer. (Doc. 140, ¶ 16; Doc. 163, ¶ 16.[6]) The chief did not have to consult with the Fire and Police Commission before modifying any policy or procedure, whether written or unwritten, regarding how IAD conducted its investigations. (Doc. 140, ¶ 17.)

IAD includes three divisions: criminal investigative, civil litigation, and administrative investigative. (Doc. 140, ¶ 18; Doc. 163, ¶ 18.[7]) Upon a citizen's complaint against an officer alleging conduct that would be criminal in nature if true, IAD opens a criminal

---

[5]The department was titled Internal Affairs Division or IAD but was renamed for a time during Hegerty's term as the Professional Performance Division or PPD, returning to the name IAD during Flynn's tenure. (Doc. 140, ¶ 18; Doc. 163, ¶ 18.) For consistency, the court will refer to the department as IAD even if an event occurred while the department was titled PPD.

[6]Lemons's proposed fact stated that it is the chief's responsibility to monitor for repeat offenders and to interrupt patterns of misconduct; she cited to Reiter's opinion for that statement. Reiter does not determine the duties or responsibilities of the MPD chief of police, nor does he provide personal knowledge that the chief is involved in or has knowledge of the activities of every employee of the MPD.

[7]The City admits to this fact but objects that Lemons's citation to the evidence supporting the fact as incorrect. (Doc. 163, ¶ 18.) Lemons cited to exhibit 13 to the Declaration of Roshna Bala Keen but also referenced it as the "Harpole Dep." Exhibit 13 is actually the transcript of the Jones deposition. Exhibit *14* is the Harpole deposition transcript. As Lemons referenced exhibit 13 and the Harpole deposition in her citation, and the page reference in the Harpole deposition includes the alleged fact, the court assumes the reference to exhibit 13 was a typographical or organizational error. Any objections based on this error are overruled.

internal investigation, which could lead IAD to refer the case to the district attorney's office for an evaluation, possibly with a recommendation for criminal charges. (Doc. 140, ¶¶ 19, 117; Doc. 163, ¶ 19.)

In addition to the criminal investigation, IAD conducts an accompanying internal review for rule violations, usually called an administrative investigation or companion internal investigation. (Doc. 140, ¶ 20; Doc. 163, ¶ 20; Doc. 139 Ex. 12 at 43–44.) The standard of proof for administrative investigations is preponderance of the evidence, and a completed administrative investigation would result in a disposition of sustained (allegation is true), not sustained (insufficient evidence to determine if the allegation is true), exonerated (allegation is true but defensible), and unfounded (allegation is false). (Doc. 140, ¶ 21; Doc. 163, ¶ 21; Doc. 139 Ex. 11 at 71.) Under Hegerty, the internal investigation could "be as simple as reviewing all the information in the criminal, and then just calling the officer in and asking him questions where he has no right . . . [against] self-incrimination." (Doc. 139 Ex. 12 at 43-44.) Prior to Flynn's tenure, the MPD had no written policies or procedures regarding standards for conducting internal investigations into allegations of criminal misconduct; "it was more practices." (Doc. 137, ¶ 19; Doc. 139 Ex. 12 at 41.)

All three chiefs received daily briefings about IAD. (Doc. 140, ¶ 109.) There were hundreds of investigations annually. Generally, the chief of police was notified every time an officer was accused of criminal conduct and was regularly updated about the resulting investigations. The chief was updated regularly on the status of open IAD criminal investigations, the investigation that had been conducted, IAD's findings (whether sustained or unsustained), and IAD's recommendations for discipline, whether IAD referred

9

the case to the district attorney, and how the investigation was resolved. (Doc. 137, ¶ 32; Doc. 139 Ex. 11 at 41-43, Ex. 14 at 101–02, Ex. 16 at 43, 69; Doc. 140, ¶¶ 115, 120; Doc. 163, ¶ 115.) Flynn would be notified of IAD's findings and recommendations before IAD approached the district attorney (DA). (Doc. 140, ¶ 118.) After IAD referred a matter to the DA's office for evaluation, Flynn would be informed of the DA's decision. (Doc. 140, ¶ 119.) Flynn also would learn about the internal investigations. (Doc. 140, ¶ 118.)

When notified of a new criminal allegation against an officer, the chief would be advised of the officer's prior complaint history. (Doc. 140, ¶ 116; Doc. 163, ¶ 116; Doc. 139 Ex. 14 at 109–11, 134–136, 207.) For instance, when advised of an officer's prior disciplinary history Flynn would receive a "thumbnail sketch" of what had occurred, and if cases involved the same charges Flynn would ask questions about why the prior allegation had not been sustained, what could or could not be proved, and what was affirmatively disproved. (Doc. 140, ¶ 121.)

During his first year as chief, Flynn would receive an oral report from IAD and have in front of him a "hard card" with a list of prior transgressions and the "charges and specifications," including a report of conduct alleged, what the investigatory findings were and what violations were determined to have occurred. (Doc. 139 Ex. 11 at 63-64; *see* Doc. 140, ¶ 122; Doc. 163, ¶ 122.) He used this information in deciding whether to discipline an officer. Flynn has stated that if the DA ruled that probable cause existed but the case was not strong enough for prosecution, he expected a "hard look" at whether the IAD administrative findings made a case for a rule violation. (Doc. 139 Ex. 11 at 92; *see* Doc. 140, ¶ 124; Doc. 163, ¶ 124.)

10

Within the first few months of becoming chief, Flynn met multiple times with Lieutenant Dubis, a high-ranking member of IAD, and discussed various pending discipline cases; Flynn also met with Lieutenant Kurt Leibold. (Doc. 140, ¶ 112.) He learned the strengths and weaknesses of IAD and spoke with senior members of IAD about that department. Flynn made clear that he wanted to know if there were any significant issues in IAD. (Doc.140, ¶ 113.) He had confidence that his IAD commanding officers kept him informed of all serious allegations against MPD officers; there was never an occasion when Flynn discovered that a serious allegation of criminal conduct had been made against an officer and he had not been notified of it. (Doc. 140, ¶ 114.)

Hegerty made no changes to the way work was done within the IAD. (Doc. 140, ¶ 125'.) During Flynn's tenure he did not take any steps to evaluate the quality or adequacy of IAD investigations into police-officer misconduct. (Doc. 140, ¶ 124'; Doc. 163, ¶ 124'.) Flynn made no changes to the manner in which IAD investigated individual allegations of misconduct. (Doc. 140, ¶ 124'; Doc. 163, ¶ 124'.) Moreover, Hegerty has stated that she did not personally conduct any audits of IAD to make sure that their investigations were thorough. Further, Flynn was not aware of any audits or evaluations of the IAD complaint system conducted by the City. (Doc. 139 Ex. 11 at 120, Ex. 12 at 97.)

2. Cates's personnel history

Prior to July 2010 Cates was the subject of various complaints. However, there were no sustained allegations that Cates engaged in sexual activity while on duty. (Doc. 117, ¶ 38; Doc. 137, ¶ 38.) And Cates's semi-annual employee evaluations, prepared by immediate supervisors concerning his job performance while at District 3 indicated no

11

areas of concern; the superiors thought he would have been a good candidate for sergeant.  (Doc. 140, ¶ 129; Doc. 163, ¶ 129.)

### a.    Officer C

In 2000, Cates was arrested for domestic violence toward his girlfriend, who was also a police officer (Officer C).  Officer C accused Cates of choking her until she almost blacked out, pushing her, and causing a cut lip.  (Doc. 140, ¶ 34.)  Cates acknowledged to an investigator that he and Officer C had argued, but Cates denied choking or pushing Officer C and causing her to fall.  (Doc. 140, ¶ 35; Doc. 163, ¶ 35.)  Cates entered a deferred prosecution agreement with the DA requiring anger- management counseling and a "no violent contact order."  (Doc. 140, ¶ 36; Doc. 163, ¶ 36.)  A domestic violence conviction would have made Cates ineligible to carry a gun, which would have prevented him from continued employment as a police officer.  (Doc. 140, ¶ 36; Doc. 163, ¶ 36.) Over a year later, Jones imposed a two-day suspension for the incident with Officer C but did not modify Cates's police powers or discipline Cates for untruthfulness.  (Doc. 140, ¶ 37.)

### b.    SW

In April 2005, a highly intoxicated female named SW was arrested and booked into MPD's prisoner processing section (PPS), where Cates was assigned to work at the time. Cates and his sergeant, Eddie Rhone, moved SW into a solitary cell and then into a more isolated cell that was not easily visible, departing from standard practice for male officers moving female prisoners.  (Doc. 140, ¶ 41.)  Afterward, Cates and Rhone watched SW masturbate in her cell.  Later, Cates admitted to watching SW masturbate.  (Doc. 140, ¶ 42.)

12

As SW was being transferred from PPS, she asked publicly which officer was "talking dirty" to her. (Doc. 140, ¶ 44.) Cates was then observed making a "beeline" to the head jailer's office. (Doc. 140, ¶ 44; Doc. 163, ¶ 44; Doc. 139 Ex. 31 at MPD01879–80.)

Initially, SW complained that she was sexually assaulted and spoken to in a sexually explicit manner by unknown members of the MPD. (Doc. 139 Ex. 31 at MPD01872; *see* Doc. 140, ¶ 43.) She later stated that she could not remember if sex actually occurred, but she remembered being touched by an officer who said "Suck my dick and I'll get you out of here." (Doc. 140, ¶ 43.) She identified the officer as a black male, late 20s, 5'6", medium build, light complexion, short hair, with small round glasses and a brown uniform. (Doc. 163, ¶ 43; Doc. 139 Ex. 31 at MPD01872.) Approximately five hours after her arrest, SW's blood-alcohol level was 0.18%. (Doc. 163, ¶ 46; Doc. 139 Ex. 31 at MPD01373–74.) Cates was 5'11", did not wear glasses, and wore a navy blue uniform. (Doc. 163, ¶ 43; Doc. 139 Ex. 30 at 01430.)

IAD opened a criminal investigation into SW's allegations. (Doc. 140, ¶ 46.) The investigation was closed with a note stating "all solvability exhausted," and SW's allegations were never referred to the district attorney's office. (Doc. 140, ¶¶ 46, 61.) According to the City defendants, investigators interviewed SW and her sister, mother, and boyfriend; the sergeant in charge; the "female booker"; and the processing officer. In addition, according to the City defendants, the investigators processed the cell where the alleged assault occurred for evidence, reviewed PPS videos, reviewed all MPD reports generated by SW's arrest, and reviewed PPS records regarding duty assignments. (Doc. 163, ¶ 46.) Lemons's expert, Lou Reiter, however, opines that the investigation was minimal and did not include several necessary steps, such as interviewing MPD officers

13

or other witnesses present that night, interviewing the accused officers, or reviewing documentation regarding that night in PPS. (Doc. 140, ¶ 46.)

An administrative investigation commenced in fall 2005. (Doc. 140, ¶ 47; Doc. 163, ¶ 47.) Two officers told IAD that Cates had a propensity to be nicer to female inmates than to male inmates and that frequently he was observed talking to females in the bullpen for extended periods of time for no professional reason. One officer told an IAD interviewer that she had told Cates to leave female inmates alone and another stated that he believed Cates to be unprofessional in behavior towards women. (Doc. 140, ¶ 47; Doc. 163, ¶ 47; Doc. 139 Ex. 31 at MPD01878, MPD01880.) Two different officers reported that Cates was not wearing his nametag when he was discovered watching SW masturbate. An officer's failure to wear his or her nametag violates MPD rules. (Doc. 140, ¶ 48; Doc. 163, ¶ 48.) During the administrative investigation Cates violated an order to not communicate with anyone about the investigation, as he spoke with another officer who had been interviewed by IAD. (Doc. 140, ¶ 50.)

Hegerty terminated Rhone for untruthfulness regarding the SW incident. In Hegerty's opinion, untruthfulness is a type of violation that leaves a police officer unable to serve because it adversely affects credibility and ability to testify. (Doc. 140, ¶ 49.)

Cates received a six-day suspension from Hegerty for mistreatment of a prisoner and a two-day suspension for failure to obey an order of an officer of higher rank (i.e., the order not to talk with others about the investigation). (Doc. 140, ¶ 51.) Also, as a result of the SW investigation, Cates was transferred from PPS and back to regular patrol duty at a district station. (Doc. 163, ¶ 51; Doc. 171, ¶ 25.) Cates understood his punishment to be for "mistreatment of a prisoner," not sexual misconduct, and the personnel order

14

imposing the suspension contains no sexual-misconduct allegations. (Doc. 140, ¶ 51.) He was not disciplined by Hegerty for removing his nametag or lying about it; that possible infraction was "rolled . . . into" the six-day suspension for mistreatment of a prisoner. (Doc. 140, ¶ 49; Doc. 139 Ex. 12 at 144–45.)

Lemons's police-practices expert opines that there was sufficient credible evidence of other serious rule violations such that Cates should have been disciplined more severely, for sexually inappropriate behavior, attempting to gain sexual favor by use of police authority, concealing his identity by removing his nametag, and lying to IAD investigators. (Doc. 140, ¶ 53.)

When asked at deposition about possible discipline if credible evidence showed that an officer told a prisoner "Suck my dick and I'll get you out of here," Hegerty stated that she would not impose substantial discipline: "It would probably be maybe a day, two days. . . . Because nothing occurred . . . it was just a stupid off-the-cuff remark that an officer made that he shouldn't have." (Doc. 140, ¶ 54; Doc. 163, ¶ 54; Doc. 139 Ex. 12 at 126–27.)

c.    TC

In March 2007, a woman named TC, after being arrested for retail theft, reported that while she was in the PPS on a previous occasion, Cates had sex with her and told her that if she complied he would get her out of jail. IAD opened a criminal investigation and interviewed TC, who told the investigator that after she was arrested in late February 2006, she was taken to PPS and an officer named Cates took her to an individual cell and had sex with her. (Doc. 163, ¶ 46; Doc. 139 Ex. 38 at MPD02496–98.) TC told the investigator that Cates wore a condom, ejaculated, then kept his condom on when he zipped up his pants. (Doc. 140, ¶ 56; Doc. 163, ¶ 56.)

15

Department records revealed that TC was arrested early on Saturday, February 25, 2006, but that Cates did not work that weekend. (Doc. 139 Ex. 38 at MPD02497–98.) When told that Cates did not work that weekend, TC responded: "Well, I don't know when it happened but I know I had sex with him" and that maybe it happened in October 2005. . . . Maybe it happened in October of 2005. I'm not sure." (Doc. 139 Ex. 38 at MPD02498.) However, there was no record of TC being arrested by MPD police in October 2005. (*Id.*)

During the interview with IAD, TC at times spoke with a child-like tone and repeatedly scratched the top of her head. SW revealed that her real name was different ("LM" for present purposes), that she had been diagnosed with bipolar disorder, and that she had not taken any medications for her condition since the previous year. (*Id.* at MPD02497)

MPD records indicated that Cates worked three dates on which TC was arrested and processed at PPS, but that the only date close in time to February 2006 was January 24, 2006. (Doc. 139 Ex. 38 at MPD02499.) However, on that date TC was booked for a prostitution and probation offense, placed in the female bullpen, and released the next morning. (*Id.*) Cates admitted to having seen TC while working at PPS, but denied engaging in any sexual activity with her. (Doc. 140, ¶ 57.)

The IAD investigator concluded that TC probably had mental-health issues, that "[a]ll solvability ha[d] been exhausted," and that the evidence did not support probable cause to proceed further. The investigator requested closure of the investigation as "SUSPENDED–pending any new or additional information" and a supervisor concurred, with the notation "file pending additional information." (Doc. 140, ¶ 58; Doc. 140, ¶ 58;

16

Doc. 38 at MPD02499.)  IAD representatives did not notify the district attorney's office about the allegations of TC.  (Doc. 140, ¶ 61.)  After the criminal investigation concluded, no additional investigatory work was conducted by the internal or administrative side of IAD.  (Doc. 140, ¶ 58; Doc. 163, ¶ 58.)

Lemons's expert, Reiter, opines that IAD should have interviewed other officers in PPS who worked on the nights that Cates and TC were both present, interviewed other prisoners present that night, determined whether TC made any report to a third party, and investigated whether any physical evidence existed.  (Doc. 139 Ex. 17, ¶¶ 75, 79.)  Reiter concluded that the decision to not take any of these investigative steps indicated a "striking indifference" to TC's allegations.  (Doc. 140, ¶ 63; Doc. 139 Ex. 17, ¶¶ 76, 78.)[8]

The profile of a vulnerable individual who is easier prey for a sexual predator includes those who are arrested for prostitution, are arrested multiple times, and have mental illness.  (*See* Doc. 140, ¶ 59; Doc. 163, ¶ 59.)  Sex with a prisoner constitutes criminal sexual assault.  Wis. Stat. § 940.225.

At deposition, Hegerty stated that she believed the SW and TC allegations were "totally different":

> I don't believe that they're the same. . . . [I]t was not proved that he had any sexual contact with [SW] at all.
>
> And in the [TC] complaint, the whole thing was not sustained.  She didn't report it until a year after the investigation [sic], and then she was very insistent that it occurred on a date when he wasn't working.  And when they went back and tried to find out if it could have happened on another date,

---

[8]The City believes that investigators fully explored the evidence by interviewing TC and Cates and checking MPD records and that the investigation did not produce evidence upon which an investigator could establish that Cates engaged in unlawful activity with TC (*see* Doc. 163, ¶ 58).  According to the City, other officers would not likely remember details about the pertinent dates because of the passage of time, TC stated that the only people present were Cates and her, and she said that she did not tell anyone else about the sexual encounter because she thought no one would have believed her.  (*See* Doc. 163, ¶ 62.)

she was very insistent that it occurred on the date that she reported. She had mental illness problems.

(Doc. 139 Ex. 12 at 166-67.) Hegerty agreed that in considering the TC complaint she did not take into account any prior untruthful behavior by Cates related to removal of his nametag because he had not been charged with untruthful behavior in 2005. (*Id.* at 169–70.)

        d.    TG

In December 2007, sixteen-year-old TG told a caseworker at the Bureau of Milwaukee Child Welfare that a police officer named "Case" had intercourse with her in exchange for $100. (Doc. 140, ¶ 64; Doc. 163, ¶ 64; Doc. 139 Ex. 40 at MPD02604–05.) TG's complaint was forwarded to the MPD, which opened a criminal internal investigation on December 17, 2007. (Doc. 140, ¶ 65.)

An IAD detective interviewed TG, who said that in November 2007, while she was living with a friend, ML, an older black male police officer named Case visited ML. Later that month, ML arranged for Case to give TG a ride to work; Case drove TG home after work as well. TG reported that in the car, on the way home, Case said he would like to "get some of that" while patting her leg and asked if she wanted some money. No one was home when they returned to ML's house, so the two engaged in sex. (Doc. 140 Ex. 40 at MPD02615–17.) TG added that after sex, Case kept the condom on his penis and zipped up his pants. (Doc. 140, ¶ 65.) As Case was leaving, he handed her a $100 bill, telling her to buy something for her baby. TG told the detective that she was "horny that day," had told Case she was seventeen, and would have had sex with him even if he had not given the money to her. (Doc. 139 Ex. 40 at MPD02617.) Subsequently, TG viewed a photo

18

array and identified a photo of Cates as being "Case." (Doc. 163, ¶ 64; Doc. 139 Ex. 40 at MPD02618.) The IAD interviewer found TG to be a credible witness. (Doc. 139 Ex. 40 at MPD02608.)

Cates agreed to give a statement to the investigator without a lawyer or union representative present. He denied the allegation of sex with TG but acknowledged that he engaged in a sexual relationship with ML, regularly visited her home, and knew TG. (Doc. 149, ¶ 66.) Cates said he had told TG that if she needed anything she could call him, and after she called asking for a ride to and from work he agreed to drive her. Cates said that he did not enter the house after giving TG a ride home from work and stated he did not have sex with TG as he knew her age. Cates added that he had given TG some money on a couple occasions and that TG began calling him asking for money for her child or to buy a bus pass. (Doc. 139 Ex. 40 at MPD02621–23.)

An assistant district attorney (ADA) reviewed the evidence and agreed that Cates "probably did have sex with a girl he knew was only 16 years old." (Doc. 140, ¶ 67.) However, the ADA did not believe that TG would present herself as a reliable witness. For that and other reasons, including Cates's denial that the act occurred and TG's refusal to wear a monitor to record a conversation with Cates, the ADA "no processed" the case. (Doc. 163, ¶¶ 67, 68; Doc. 139 Ex. 40 at MPD02609, MPD02627.)

After the ADA declined not to prosecute Cates, MPD investigators did not conduct further investigatory work. (Doc. 140, ¶ 69; Doc. 163, ¶ 69.) Assistant Police Chief Kurt Leibold handled a companion internal investigation regarding the TG complaint consistent with his handling of similar complaints during his time as an IAD commanding officer. (Doc. 140, ¶ 69; Doc. 163, ¶ 69, Doc. 139 Ex. 20 at 78–78.) Leibold reviewed the internal-

complaint respecting Cates as well as Cates's disciplinary history, including concerning Officer C, SW, and TC. (Doc. 163, ¶ 71.) Leibold concluded that all avenues of investigation had been considered, that a thorough investigation had been conducted, and that the extra steps of interviewing the target officer in relation with an internal investigation had been done in the context of the criminal matter. In his view, "everything that could have been done to investigate the alleged criminal act was the same as that which would [have] been done to review the matter for rules-related violations." (Doc. 170, ¶ 13.) He then caused the internal investigation file to be closed pending receipt of any new information. Leibold did not believe that the chielf would be able to prosecute Cates for any rule violation. (*Id.* ¶¶ 14, 16.)

Leibold provided Flynn, who took office while IAD was investigating the TG matter, with with a summary of the investigatory file and Leibold's thoughts on the difficulties the chief would face regarding charges for rules violations. (*Id.* ¶ 15.) Flynn was briefed about the allegation and was advised that IAD had taken the investigation to the district attorney's office for review and potential criminal charges. (Doc. 140, ¶ 70; Doc. 163, ¶ 70.) Leibold also furnished Flynn with a review of the conclusions reached by the district attorney's office. (Doc. 163, ¶ 70; Doc. 170, ¶¶ 15, 16.)

Flynn took no steps to discipline or reprimand Cates, to supervise him more closely, or to address him about the TG matter, even though having sex with a sixteen-year-old would be grounds for termination. (Doc. 140, ¶ 69.) Flynn says he thought he would have been aware of prior allegations about sexual misconduct against Cates but had no independent recollection of being so informed during the TG matter. (Doc. 139, Ex. 11 at 171-72, 201.) At deposition, Flynn admitted that it was "disturbing" that after reviewing all

of the evidence, speaking with TG, viewing photographs, and reading an investigating report, the ADA concluded that it was probable that Cates knowingly had sex with a sixteen-year-old. (Doc. 140, ¶ 73.) In Wisconsin it is illegal for someone to have sex with a sixteen-year-old or to solicit a child for prostitution. Wis. Stat. §§ 948.08, 948.09.

In Reiter's opinion, Flynn's handling of the TG case was an "egregious departure" from generally accepted police practices. Furthermore, Reiter opined, there was substantial evidence in the criminal-side investigation upon which Flynn could have concluded that Cates had sex with a minor and that terminating Cates for that conduct would have been a reasonable response. (Doc. 140, ¶ 75.)

3. Cates's interaction with Lemons on July 16, 2010, and its consequences

On July 16, 2010, Lemons lived in the lower level unit at 2566 North 15th Street, with her two children, brother LaQuan Lemons (LaQuan), and boyfriend Jermaine Ford. (Doc. 117, ¶ 40; Doc. 140, ¶ 1.[9]) On that date, Lemons was involved in an altercation with some neighbors that included a physical fight. (Doc. 117, ¶ 41.) After the fight, Lemons went into her house, heard "pop, pop, pop," and saw that her window blinds were coming down. (Doc. 117, ¶ 42.) She called 9-1-1, indicating to the operator that the neighbors were shooting out her windows. (Doc. 117, ¶ 43.) Although Lemons had reported shooting, she later realized that bricks and bottles had been thrown through her windows. (Doc. 137, ¶ 119; Doc. 139 Ex. 2 at 57.)

At about 1:20 p.m. on July 16, 2010, Officers Ladmarald Cates and Alvin Hannah were assigned to respond to Lemons's residence; they arrived approximately twenty

---

[9]Lemons's home is sometimes identified as 2566 North 15th Street and sometimes as 2655 North 15th Street. (*See* Doc. 117, ¶¶ 40, 99.)

minutes after Lemons called.  (*See* Doc. 117, ¶¶ 45, 46, 99; Doc. 137, ¶¶ 45, 46, 99.)
Cates and Hannah were wearing their standard Milwaukee police uniforms and were
operating a marked squad car that contained a police computer.  (Doc. 117, ¶ 98.)
Lemons recognized Cates as an officer who had made two traffic stops of her in the
preceding year, but his presence on July 16, 2010, was the result of her call for police
assistance. (Doc. 140, ¶¶ 2, 3.)  During one of the traffic stops Cates had expressed that
Lemons was cute and gave her his number.  (Doc. 139 Ex. 2 at 92–93.)

Officer Hannah confirmed that Lemons had called, asked whether everything was
okay, and she replied "yes."  (Doc. 117, ¶ 47.)  Lemons's two children, Ford, and LaQuan
were at the house with her.  (Doc. 117, ¶¶ 44, 101.)  Hannah wrote their names.  (Doc.
117, ¶ 49.)

Hannah observed bricks or rocks in the home, at locations that indicated they had
been thrown through the windows.  (Doc. 117, ¶ 120.)  The officers learned of Lemons's
physical fight with her neighbors earlier that day and that the throwing of rocks or bricks
through her window was related to the fight.  (Doc. 117, ¶ 103.)  Hannah observed that
Lemons had messy hair and redness on the left side of her face.  (Doc. 117, ¶ 104.)
Believing that Lemons had been injured in the fight, Hannah called for an ambulance to
provide medical assistance. (Doc. 117, ¶ 105.) Paramedics arrived, provided Lemons with
medical assistance, and departed.  (Doc. 117, ¶¶ 106-108.)  At some point the children left.
(*See* Doc. 117, ¶ 50.)

While on scene, Hannah conducted "wanted checks" on Lemons, Ford, and LaQuan
and found that LaQuan was a wanted person.  (Doc. 117, ¶¶ 109, 110; Doc. 137, ¶ 109.)
Hannah indicated that LaQuan had an arrest warrant for running away from a boys' home,

22

but Lemons told him that she was LaQuan's guardian and that the information regarding the warrant was wrong. (Doc. 117, ¶¶ 50, 51, 112.) Hannah took LaQuan to the squad car to figure out the warrant issue. (*See* Doc. 117, ¶¶ 50, 52, 55.) Lemons said she would look for the paperwork in the meantime. (Doc. 117, ¶ 52.) She, Ford, and Cates stayed in the house. (Doc. 117, ¶ 114.) Hannah and LaQuan remained in the squad car for a while as Hannah accessed the police computer to verify the information Lemons had provided. (Doc. 117, ¶ 115.)

While Lemons looked for paperwork, Ford went to the store to buy cigarettes for her, leaving Lemons and Cates alone in the house. (Doc. 117, ¶ 53.) Ford returned five to seven minutes later. (Doc. 117, ¶ 59.) Cates then said that if he had known Ford was going to the store he would have asked Ford to get him some bottled water. (Doc. 117, ¶ 61.) Ford left for the store a second time, again leaving Lemons and Cates alone in the house. (Doc. 117, ¶¶ 63, 64; Doc. 137, ¶ 63.) During that time, Cates asked Lemons to show him the brick that had cause some of the damage, and Lemons led him to the bathroom. (Doc. 139 Ex. 2 at 93–95.) After reaching the bathroom, Lemons turned and Cates had his pants undone. Cates then sexually assaulted Lemons in the bathroom, first forcing her to perform oral sex and then penetrating her vagina with his fingers and penis. (Doc. 117, ¶ 65; *see* Doc. 140, ¶¶ 4, 5; Doc. 139 Ex. 2 at 95–98.) When he sexually assaulted Lemons, the event was nonconsensual and procured by threat and use of force, while Cates was wearing his police uniform, badge, and department-issued gun. (Doc.

140, ¶ 4.[10]) During the rape Cates strangled Lemons. (Doc. 140, ¶ 5; Doc. 139 Ex. 1 at 60.)

After the sexual assault, Lemons ran outside through the front door holding her cell phone. (Doc. 117, ¶ 66, ¶ *see id.* ¶ 67.) About that time Lemons received a call from LaQuan's "wraparound worker"; she then went to the squad car and handed her phone to Hannah so that she could speak with the wraparound worker. (Doc. 117, ¶¶ 68, 69.) At that point, Hannah learned that Lemons had been appointed as LaQuan's guardian. (Doc. 117, ¶ 116.) Hannah then allowed LaQuan out of the squad car, and Lemons followed Hannah and LaQuan back into the house. (Doc. 117, ¶¶ 71, 117.) When the three entered the house, neither Cates nor Ford was there, nor did Lemons see Cates outside. (Doc. 117, ¶ 73.) Lemons did not tell Hannah that Cates had sexually assaulted her. (Doc. 117, ¶ 74.)

Lemons spoke briefly with Hannah in the house, and Hannah and LaQuan exchanged words. (Doc. 117, ¶ 75; Doc. 137, ¶ 75.) LaQuan asked whether Hannah was going to cite or arrest any of the neighbors whom he believed were responsible for throwing the bricks. (Doc. 117, ¶ 122.) When Hannah indicated that he would not arrest anyone, LaQuan became angry and responded to Hannah with an obscenity. (Doc. 117, ¶¶ 75, 122-125; Doc. 137, ¶¶ 75, 123, 124; Doc. 139 Ex. 2 at 112.) LaQuan swore at Hannah again and walked out of the house, followed by Hannah and then Lemons. (*See* Doc. 117, ¶¶ 76, 77, 127; Doc. 137, ¶¶ 76, 77, 127.) As they exited, Lemons saw her friend Christy

---

[10] The City disputes Lemons's proposed finding 4, stating that discovery has produced conflicting evidence as to whether Cates sexually assaulted Lemons versus engaging in consensual sex with her. (Doc. 163, ¶ 4.) Whether the City can dispute in this case whether a sexual assault occurred—when Cates's conviction and issue preclusion prevent Cates from so arguing---will be addressed at a later date by the court. For present purposes, any conflicting evidence on the matter is resolved in favor of Lemons. Thus, this statement of facts assumes that a sexual assault occurred.

at the bottom of the stairs to the house and said "he raped me." (Doc. 117, ¶¶ 77, 78; Doc. 137, ¶¶ 77, 78.)

Hannah followed LaQuan, intending to arrest him for disorderly conduct or on the warrant. (Doc. 117, ¶ 128.) Hannah stopped LaQuan on the gangway between Lemons's residence and the house next door. (Doc. 117, ¶ 129.) Lemons observed Hannah and LaQuan "tussling." (Doc. 117, ¶ 80.) According to Lemons, LaQuan was on the ground and Hannah was on top holding LaQuan in a headlock; Lemons asked LaQuan to calm down. (Doc. 117, ¶ 81.)

Meanwhile, Lemons's friend Candace arrived and Lemons told Candace she had been raped. (Doc. 117, ¶ 83; Doc. 137, ¶ 83; Doc. 139 Ex. 2 at 124–25.) As Lemons spoke with Candace, Cates grabbed Lemons with both arms, like a "bear hug," swung her around and carried her away, past Hannah toward the back of the house. (Doc. 137, ¶ 83; Doc. 139 Ex. 2 at 130–32; Doc. 140, ¶ 7; Doc. 163, ¶ 7; *see* Doc. 117, ¶ 164; Doc. 137, ¶ 164.) Lemons's legs were swinging and flailing as Cates carried her. (Doc. 140, ¶ 7.)

While Hannah struggled with LaQuan to place handcuffs on him, people came behind and tried to pull him from LaQuan. (Doc. 117, ¶ 131; Doc. 137, ¶ 131.) Lemons saw Christy pull Hannah's arm and asked him to loosen his grip on LaQuan. (Doc. 117, ¶¶ 85, 131; Doc. 139 Ex. 2 at 139.) LaQuan stated that when he was on the ground Lemons tried to pull him from under Hannah. (Doc. 163, ¶ 7; Doc. 139 Ex. 52 at 26.) Cates saw Christy and Candace (identified as KB and KV) near Hannah. (*See* Doc. 139 Ex. 4 at 189, 191.)

Hannah felt two taps that he believed were kicks then saw Cates grabbing Lemons; he did not observe who kicked him. (Doc. 137, ¶ 136; Doc. 139 Ex. 24 at 86.) Lemons's

25

arms and legs were flailing—Cates's grabbing of Lemons may have caused her legs to swing into Hannah. (Doc. 137, ¶ 136; Doc. 140, ¶ 7; Doc. 139 Ex. 1 at 458-49, Ex. 2 at 126-27.) Cates has said that while he was holding Lemons she kicked out and kicked Hannah in the back. (Doc. 117, ¶ 165; Doc. 137, ¶ 165; Doc. 139 Ex. 4 at 185-90.)

Lemons does not recall kicking any other officers that day and testified at deposition that she did not kick Hannah. (Doc. 139 Ex. 2 at 194, 270 ("I just heard him saying that they was giving me tickets for kicking Officer Hannah, which I did not do.").)

Backup officers arrived and ran toward the front of Lemons's home. (Doc. 117, ¶¶ 86, 87.) Eventually, Hannah was able to take LaQuan into custody and handcuff him. (Doc. 117, ¶ 134.) Hannah also made the decision to arrest Lemons. (Doc. 122, ¶ 44.) He directed other officers to arrest Lemons and two of her female friends because he believed they interfered with his attempt to take LaQuan into custody. (Doc. 117, ¶¶ 88, 135; Doc. 137, ¶¶ 88, 135; Doc. 139 Ex. 2 at 141–43; Doc. 122, ¶¶ 43, 44.) Lemons described the scene as "fast" and "chaotic." (Doc. 117, ¶ 89; Doc. 137, ¶ 89; *see* Doc. 139 Ex. 2 at 270–71, 278.) She told some of the arriving officers that an officer raped her. (Doc. 139 Ex. 2 at 142–44.)

Cates handcuffed Lemons. (Doc. 140, ¶ 8.) An Officer DeWitt escorted Lemons to a conveyance vehicle where Lemons remained on the scene for between five and twenty minutes. (Doc. 137, ¶ 178; Doc. 139 Ex. 2 at 144, 155, Doc. 165, ¶ 10.) Another officer transported Lemons to the Third District station. (Doc. 163, ¶ 8, Doc. 165, ¶ 10.)

At the station, Cates entered the interview room where Lemons was held alone. (Doc. 139 Ex. 2 at 171–72.) He told Lemons to "stop saying" that she had been raped and that

26

*if you do that, they not gonna believe you. And this whole unit is my friends.
I got a lot of police friends. If you tell them that, they not gonna believe you.
Only discipline gonna happen to me is I might get a suspension, but I'll be
back and I'll ask somebody to come holler at you.*

(Doc. 140, ¶ 10; Doc. 139 Ex. 2 at 173.) Cates added that if Lemons said anything his
friends would "get" her but that if she did not say anything he would help her and her
children move. (*Id.* at 173.)

Lemons testified that after she was placed into a cell she awakened and felt like she
was choking then started vomiting. (Doc. 117, ¶ 90.) She was taken to a hospital for
treatment that included an evaluation and examination in the hospital's sexual-assault unit.
(Doc. 117, ¶¶ 92, 93.) Lemons believes she was transported to the hospital around
midnight. (Doc. 137, ¶ 173; Doc. 139 Ex. 2 at 196-97.) After her release from the hospital,
Lemons was transported to the Milwaukee County Criminal Justice Facility, where she
remained for four days in the custody of the county sheriff's department. (Doc. 117, ¶¶ 94,
173.) She was never charged with any crime relating to the events of July 16, 2010. (Doc.
140, ¶ 8; Doc. 163, ¶ 8.)

At no time on July 16, 2010, were former Chief Hegerty and Chief Flynn at Lemons's
home. (Doc. 117, ¶ 138.)

IAD opened an investigation into Lemons's allegations of sexual assault and
interviewed Cates. Initially, Cates lied to the investigator and said he had no sexual
contact with Lemons. Later he recanted and admitted to on-duty sexual contact with
Lemons while claiming that the sex was consensual. (Doc. 140, ¶ 11; Doc. 163, ¶ 11.) On
or about December 3, 2010, Flynn discharged Cates from the MPD for two counts of

27

"untruthfulness" and one count of "idling and loafing" while on duty. (Doc. 117, ¶ 39; Doc. 137, ¶ 39; Doc. 140, ¶ 12; Doc. 163, ¶ 12; Doc. 139 Ex. 8 at MPD0552.)

In February 2011, Flynn told a reporter: "It is clear to me looking at this employee's record that from a management point of view an obvious pattern was overlooked" and "[t]he department did not see the forest for the trees here." (Doc. 137, ¶ 36; Doc. 140, ¶ 77; Doc. 139 Ex. 11 at 205.) Further, Flynn stated that "[i]f there is a pattern even of unsubstantiated allegations, we recognize it requires a closer look." (Doc. 137, ¶ 36; Doc. 140, ¶ 77; Doc. 139 Ex. 11 at 205.)[11]

The Milwaukee County district attorney declined to charge Cates with any crime. (Doc. 140, ¶ 13.) However, the U.S. Department of Justice prosecuted Cates. (Doc. 140, ¶ 13.) *See also United States v. Cates*, No. 11-CR-200, indictment at 1 (E.D. Wis. filed Sept. 20, 2011). On January 11, 2012, a federal jury convicted Cates of willfully sexually assaulting Lemons on July 16, 2010, while acting under color of law, depriving Lemons of her due process right to bodily integrity. (Doc. 140, ¶ 14; Doc. 139 Ex. 3, Ex. 10 at 13.) *See also United States v. Cates*, No. 11-CR-200, indictment at 1 (E.D. Wis. filed Sept. 20, 2011); *United States v. Cates*, No. 11-CR-200, verdict (E.D. Wis. filed Jan. 11, 2012). Cates is serving time at a federal correctional institution as a result. (*See* Doc. 117, ¶ 151.)

Cates admits that he engaged in sexual activity with Lemons on July 16, 2010, but maintains he did not strangle or rape Lemons and that the sexual activity was consensual.

---

[11]The City says these statements were made based on limited information and that Flynn subsequently reviewed Cates's investigatory files in greater detail and concluded that they do *not* establish an obvious pattern of misconduct that was overlooked. (*See* Doc. 163, ¶ 77.) Regardless, Flynn made the statements.

(Doc. 117, ¶ 163; Doc. 137, ¶ 163; Doc. 139 Ex. 4 at 180.[12])  However, the jury at his criminal trial found that the sexual encounter was nonconsensual.  (*See* Doc. 139 Ex. 10 at 14–15.)

Cates has said that he knew having sex on duty could lead to suspension or termination and that an officer's sexual assault while on duty could be cause for charges and jail or prison.  (Doc. 117, ¶¶ 161, 168; Doc. 137, ¶ 161, ¶ 168; Doc. 139 Ex. 4 at 116–17, 242.)  Cates testified that he did not initially tell the truth about his sexual activity with Lemons initially because he was afraid that any such admission would impact his marriage and he was worried that he would be suspended or terminated if the MPD found out that he had sex with Lemons.  (Doc. 117, ¶ 172.)

At deposition Cates stated that his motivation for engaging in various sex acts with Lemons was his desire to have sex with her as well as his desire to seek out and obtain personal physical pleasure.  (Doc. 117, ¶¶ 170, 171.[13])

4.     Sexual misconduct by other police officers

During Jones's tenure as chief, an Officer Steven Lelinski committed a series of sexual assaults.  (Doc. 139 Ex. 13 at 75.)  Jones has stated that he was sure Lelinski had engaged in criminal sexual misconduct, but because the DA did not prosecute, he chose

---

[12]Lemons objects to this proposed finding of fact based on collateral estoppel due to Cates's conviction for sexual assault.  (*See* Doc. 137, ¶ 163.)  However, whether collateral estoppel applies is a question of law, not fact, and such an argument does not negate Cates's statement at deposition.

[13]Lemons objects to these factual statements.  She contends that this testimony by Cates is inadmissible because the jury at Cates's criminal trial found that the sexual encounter was not consensual and this testimony undermines his conviction.  Further, according to Lemons, sexual assault is an act of violence, not sexual gratification. (Doc. 138, ¶¶ 170, 171.)  These objections raise legal arguments about the effect of this testimony, but do not undermine a conclusion that Cates made these statements at deposition; thus Lemons's objections must be overruled.

not to order any internal discipline. (Doc. 140, ¶ 94; Doc. 139 Ex. 13 at 141–42.) According to Jones,

> when the District Attorney did not issue, I asked that Internal Affairs revisit that, those issues with the District Attorney's office and they still refused to issue; and under the circumstances that I found myself under with when the District Attorney didn't issue, it's almost like it didn't happen. The criminal aspects did not happen, and, therefore, I could not substantiate an internal discipline even though in my mind I was sure that those, that misconduct did take place.
>         . . . .
>     And I did not pursue those charges with Lewinsky [sic].

(Doc. 139 Ex. 13 at 142.) Jones admitted that he found it incredible that the DA's office said repeatedly that the alleged victims were not credible witnesses. (Doc. 140, ¶ 94.)

When asked why Lelinski was not terminated or substantially disciplined in view of the number of sexual misconduct complaints against him, Hegerty stated: "Because most of these sexual assault complaints were – were not sustained, and I don't believe you can discipline an officer based on unsubstantiated complaints." (Doc. 139 Ex. 12 at 84.) Lelinski remained on the force and was terminated in August 2006. (*See id.*)

Prior to his rape of Lemons, Cates was aware of Lelinski's firing and conviction for having sexual contact with prostitutes. (Doc. 117, ¶¶ 166, 167; Doc. 137, ¶¶ 166, 167.[14])

In 2010, LR complained that Officer Michael Vagnini searched his buttocks to recover a bag of crack cocaine from between LR's cheeks. (Doc. 140, ¶ 99; Doc. 163, ¶ 99.) Vagnini was not disciplined for LR's complaint. (Doc. 140, ¶ 100.) Two years later, after the LR file was reopened, Vagnini was charged with sexual assault for his 2010

---

[14]Lemons denies these proposed statements of fact because Cates testified that he did not recall begin told at roll call anything about Lelinski's termination or discipline but instead may have heard about it through the news or in passing conversations with other officers. (Doc. 137, ¶¶ 166, 167.) However, the proposed statements of fact are merely that Cates was aware and make no mention of how Cates became aware, so the objections to this statement are overruled.

contact with LR and other sexual assaults that occurred after the LR incident. (Doc. 140, ¶ 100.) At sentencing, Vagnini's attorney pointed to IAD's repeated dismissals of complaints against him and positive evaluations from his supervisors. (Doc. 140, ¶ 101.)

In discovery the City provided 153 IAD files and a spreadsheet titled "Milwaukee Police Department Complaints Involving Sexual Contact, January 1, 1998 to present" (meaning March 10, 2014), based on a computerized search of records using terms such as "sexual assault," "sexual harassment," "sexual gratification," "sexual contact", or "exposing genitals." (Doc. 140, ¶¶ 22, 79; Doc. 163, ¶¶ 22, 79, 81; Doc. 139 Ex. 21.) The spreadsheet may not be complete as to all sex-related complaints depending on the terminology used in the records. (*See* Doc. 140, ¶ 22; Doc. 163, ¶ 22.) According to Lemons's expert, Reiter, the files included 128 criminal cases with a tie to sex. (Doc. 140, ¶ 81; Doc. 160, ¶ 81.)

From his review of over 100 of the IAD investigative files, Reiter identified various investigative practices that he believes were flawed or biased. (Doc. 140, ¶ 82.[15]) In Reiter's opinion, frequently police sexual assault victims include vulnerable populations such as prostitutes, females who encountered police in police business, female juveniles, people with mental disabilities, and domestic violence victims. In Reiter's opinion, the IAD files he reviewed followed that trend and IAD's custom was to credit the officer's denial over the victim's complaint. (Doc. 140, ¶ 83.[16]) In Reiter's opinion, IAD investigations sometimes required multiple interviews or wearing a wire, and when complainants

_____

[15]The City disagrees, saying that MPD was not deliberately indifferent regarding IAD investigatory practices. (Doc. 163, ¶ 82.)

[16]The City objects to this proposed finding and several of the following ones, disagreeing with the accuracy of Reiter's opinion. But the court merely cites the opinion for what Reiter says, not for his accuracy.

31

eventually refused further interviews a case most often was closed by blaming "an uncooperative victim." (Doc. 140, ¶ 84.) Further, says Reiter, if the district attorney did not initiate criminal charges and an officer did not admit to a rule violation, the MPD did not impose internal discipline on an officer, thereby exhibiting deference to the DA's decision even though internal discipline has a lower standard of proof and hearsay rules do not apply. (Doc. 140, ¶¶ 85-87.) According to Reiter, this practice violates established standards for internal investigations. (Doc. 140, ¶ 87.) Reiter cites at least three examples of instances where the criminal investigation was over the administrative investigation involved little or no follow-up and, he believes, the lower, preponderance standard could have been satisfied. (Doc. 140, ¶ 88.) In Reiter's opinion, MPD had a pattern of underinvestigating and not disciplining officers, which permitted sexual predators within the department to commit repeat offenses with impunity. (Doc. 140, ¶ 90.) Additionally, according to Reiter, MPD ignored prior complaints and disciplinary records of officers as a matter of custom and practice. (Doc. 140, ¶ 91.[17])

No MPD program tracks or monitors officers who have been the subject of multiple criminal complaints. When a new IAD criminal investigation is opened, an investigator accesses the IAD criminal database, prints a hard copy of the target officer's prior criminal allegations, and reviews those allegations with the supervising lieutenant before proceeding with an investigation. (Doc. 171, ¶ 4.) Historically, the lieutenant assigned to the criminal section of IAD checked or noticed trends or patterns of criminal allegations when disseminating and reviewing criminal investigations. Patterns would be relayed to

---

[17]The City disputes this proposed statement of fact, pointing to the affidavits of Leibold and Hoerig, who at different times were the most senior supervisor assigned to the IAD. (Doc. 163, ¶ 91.)

32

IAD's commanding officer, who in turn would notify the chief. (Doc. 140, ¶ 103; Doc. 163, ¶ 103; Doc. 139 Ex. 23, ¶ 19.) Thus, when an officer is the subject of a new complaint his prior history is brought to the attention of the chief. (*See* Doc. 140, ¶ 140; Doc. 163, ¶ 140; Doc. 139 Ex. 11 at 100–01.)

Reiter believes it is inadequate that a department with more than 1000 officers has relied on an IAD lieutenant remembering that a particular officer was receiving complaints or looking at the subject officer's history when a new complaint was made. (Doc. 140, ¶ 105; Doc. 139 Ex. 17, ¶ 159.) In Reiter's opinion, MPD had a custom of failing to meaningfully investigate or discipline officer sexual misconduct. (Doc. 140, ¶ 126'; Doc. 139 Ex. 17, ¶ 170.) Further, according to Reiter, sexual and domestic misconduct involving police officers is "widespread throughout policing." (Doc. 140, ¶ 23; Doc. 139 Ex. 17, ¶ 13.)

## DISCUSSION

Lemons's claims are brought under 42 U.S.C. § 1983. To state a claim for relief under § 1983 a plaintiff must allege that (1) she was deprived of a right secured by the Constitution or laws of the United States, and (2) that the defendant(s) acted under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Waubanascum v. Shawano County*, 416 F.3d 658, 665 (7th Cir. 2005). Here, the second element is met; the City does not dispute for purposes of this motion that the individual defendants acted under color of state law.

Lemons asserts a violation of her due-process rights by Cates (count I), violations of her Fourth Amendment rights by Cates and Hannah through improper seizure and excessive force (counts II and III), unlawful detention by Cates and Hannah (count IV), and

33

failure of Hegerty and Flynn to supervise and discipline (count VII).[18] In addition, Lemons asserts that Cates's and Hannah's actions occurred within the scope of their employment and pursuant to the policies and practices of the MPD.

A.    Lemons may pursue her substantive-due-process claim as well as her Fourth-Amendment claims

Citing *Graham v. Connor*, 490 U.S. 386 (1989), the City defendants contend that Lemons's substantive due process liberty claim (count I) must be dismissed in favor of her Fourth Amendment seizure claim (count II). In *Graham*, the Supreme Court stated that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." 490 U.S. at 395; *see id.* at 388. Although the argument has some initial appeal, it does not withstand scrutiny. The Supreme Court's broad statement in *Graham* that its decision applies to *any* seizure of a free citizen is dicta; *Graham* involved claims of excessive force during an investigatory stop. In other portions of the opinion the Court confined its discussion to investigatory stops and arrests, leaving open the possibility that some instances of force used on citizens may fall outside of *Graham*'s holding: "Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment . . . ." *Id.* at 394; *see also id.* (stating that *in most instances* a challenged application of force will invoke rights under the Fourth or Eighth Amendments); *id.* at 396 (stating that the Fourth Amendment's reasonableness

---

[18]In response to the City defendants' motion for summary judgment, Lemons expressly dropped various additional claims. Those claims were dismissed previously.

test requires careful attention to the facts and circumstances of each case, including the severity of the crime at issue and whether a suspect poses an immediate threat to safety).

Arrests and investigatory stops involve some acceptable use of force. *Id.* at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). The present case, to the contrary, involves the theory that *no* acceptable use of force against Lemons was allowed while she and Cates were alone inside her house. Lemons was a complainant, not a suspect. The Fourth Circuit, post *Graham*, recognized this very distinction, stating that

> [b]ecause the harm inflicted did not occur in the course of an attempted arrest or apprehension of one suspected of criminal conduct, the claim was not one of a Fourth Amendment violation, but of the violation of the substantive due process right under the Fourteenth Amendment not to be subjected by anyone acting under color of state law to the wanton infliction of physical harm.

*Jones v. Wellham*, 104 F.3d 620, 628 (4th Cir. 1997) (citation omitted); *cf. Pyka v. Vill. of Orland Park*, 906 F. Supp. 1196 (N.D. Ill. 1995) (stating that "the Fourth Amendment protects a person from the initial moment of seizure (the arrest) through the period of custody that culminates in a formal arraignment or probable cause hearing").

In several decisions since *Graham*, courts have recognized and permitted substantive due process claims by victims of sexual assault by law-enforcement officials. The Seventh Circuit has indicated that protected liberty under the due process clause includes the right to bodily integrity and that rape, as a very serious battery, committed under color of state law is actionable under § 1983 as a deprivation of liberty without due process. *Alexander v. DeAngelo*, 329 F.3d 912, 916 (7th Cir. 2003); *Wudtke v. Davel*, 128

35

F.3d 1057, 1063 (7th Cir. 1997).  According to the Seventh Circuit, the liberty claim of a right to bodily integrity has often been recognized as a part of substantive due process. *Wudtke*, 128 F.3d at 162.  District courts in this circuit have cited *Wudtke* and *Alexander* as support for the proposition that sexual assault can violate substantive due process rights relating  to the liberty interest in bodily integrity.  *Nagle v. McKernan*, No. 07 C 680, 2007 WL 2903179, *1 (N.D. Ill. Sept. 28, 2007);  *Decker v. Tinnel*, No. 2:04-CV-227, 2005 WL 3501705, *7 (N.D. Ind. Dec. 20, 2005) ("Touching that amounts to a 'serious' sexual assault implicates the substantive due process liberty interest in bodily integrity.");  *see Bean v. Ind. Univ.*, 855 F. Supp. 2d 857 (S.D. Ind. 2012) (recognizing that a serious battery can rise to the level of a constitutional violation and comparing facts in *Bean* (a police officer knocking down the plaintiff) to the sexual assaults in *Wudtke* and *Alexander*).  The Fourth Circuit in *Jones* found that the substantive due process claim was proper while the Fourth Amendment claim was not, though it found that the trial court's reference to both constitutional provisions was not prejudicial.  104 F.3d at 628 & n.4.

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998), also cited by the City defendants, does not alter this reasoning.  *County of Sacramento* involved a police chase of a motorcycle, which resulted in the death of the motorcycle's passenger.  Defendants contended that the estate and parents of the decedent could not bring a substantive-due-process claim because the Fourth Amendment applied.  The Supreme Court found that no seizure occurred under the Fourth Amendment because the police did not intentionally apply means to stop the decedent, so the due-process claim was not barred.  *Id.* at 843-44.  The Court noted that a seizure occurs "'when there is a governmental termination of freedom of movement *through means intentionally applied*.'"  *Id.* at 844 (quoting *Brower*

36

*v. County of Inyo*, 489 U.S. 593, 596-97 (1989)). However, the facts of the case were limited to a police chase entailing suspected illegal conduct, not broader facts suggesting that the decision extends to sexual assault by a police officer. The Court did not find that *Graham* barred all constitutional claims relating to physically abusive government conduct other than under the Fourth or Eighth Amendments, but that a constitutional claim covered by one of those amendments should be analyzed under the standard of those amendments, rather than substantive due process standards. *Id.* at 843. Neither *Alexander*, *Nagle,* nor *Decker*, all post-*County of Sacramento*, suggest that *County of Sacramento* bars a substantive due process claim regarding sexual assault by a police officer.

Moreover, the *County of Sacramento* Court emphasized that the touchstone of due process is protection of an individual against arbitrary action of government, whether from denial of procedural fairness or "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Id.* at 845-46. The due process clause is meant to prevent government officials from abusing their power or employing it as an instrument of oppression. *Id.* at 846. A rape of a citizen by a police officer who was called for help appears to fit the mold as an abuse of power. The unwanted invasion of a man's penis into a woman's vagina is possibly the prime example of a violation of bodily integrity.

Thus, *Graham* and *County of Sacramento* do not foreclose Lemons's substantive due process claim. Moreover, Lemons may proceed to trial on due process and Fourth Amendment theories. The City defendants do not ask that the Fourth Amendment claim be dismissed in favor of the substantive due process claim—they ask the reverse. Thus,

37

unlike the *Jones* court, this court does not find the Fourth Amendment claim is prohibited. *See Decker*, 2005 WL 3501705 (addressing on the merits a Fourth Amendment claim and substantive-due-process claim brought by a woman against an officer who forced his hand between her thighs near her vagina, touched her breast, and tried to French kiss her); *see also Bean*, 844 F. Supp. 2d at 861-65 (addressing substantive-due-process claim and Fourth-Amendment claim brought by woman knocked down by police officer).

Further, because the law in this circuit was clearly established by 2003 (*Wudtke*) that the right to bodily integrity encompassed the right to be free from sexual assaults, no individual defendant can suggest that qualified immunity applies due to legal uncertainty. *See Wudtke*, 128 F.3d at 1063 (citing *Stoneking v. Bradford Areas Sch. Dist.*, 882 F.2d 720 (3d Cir. 1989), as finding such a right recognized in the 1980s).[19]  Thus, the City defendants' motion is denied as to count I.

B.    One Fourth-Amendment claim against Hannah continues while one is dismissed

Lemons claims that Hannah arrested her without probable cause (count II) and detained her for an excessive period of time without probable cause or providing her with a judicial determination of probable cause (count IV).  (Doc. 108, ¶¶ 57, 69.)  The City defendants argue that these claims against Hannah must be dismissed because Hannah did not effect Lemons's arrest and that, even if he did, he had probable cause to arrest her. The existence of probable cause to arrest precludes a § 1983 suit for illegal seizure by false arrest.  *Morfin v. City of E. Chicago*, 349 F.3d 989, 997 (7th Cir. 2003).

---

[19]Qualified immunity shields government officials performing discretionary functions from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  If the law at the time was not clearly established then the official could not know that the conduct was unlawful. *See id.*

38

That Hannah did not physically put handcuffs on Lemons or place her in a squad car does not mean he cannot be held liable for her illegal arrest (assuming it was illegal). A § 1983 claim requires personal involvement by the defendant. *Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1901 (2015). Taking the facts in Lemons's favor, Hannah directed one or more other officers to arrest her. Hannah admitted that he decided to arrest Lemons because she physically assaulted him and obstructed his arrest of her brother and that he personally directed other officers to arrest her. (Doc. 122, ¶¶ 43, 44.) Therefore, he was personally involved in the arrest such that he can be held responsible if the arrest was unlawful.

The City defendants contend that police had probable cause to arrest Lemons for obstructing Hannah in the performance of his duties and kicking him (and possibly another officer). A law enforcement officer has probable cause to make an arrest "when the facts within the officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a prudent person in believing the suspect has committed or is committing an offense." *United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003) (internal quotation marks omitted). "Probable cause requires only a substantial chance of criminal activity, not an actual showing of such activity." *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)). Mere suspicion is not enough. Nevertheless, "probable cause 'need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false.'" *Id.* (quoting *United States v. Burrell*, 963 F.2d 976, 986 (7th Cir. 1992)). The determination of whether probable cause exists in a particular situation involves examining the totality of the

39

circumstances in a common sense manner. *United States v. Sawyer*, 224 F.3d 675, 679 (7th Cir. 2000); *see also Gates*, 426 U.S. at 238.

Some evidence suggests that Lemons kicked or interfered with Hannah. Hannah felt two kicks and turned around to see Lemons being held by Cates. LaQuan testified at deposition that Lemons was trying to get Hannah off of him or get him out from under Hannah. However, that evidence is disputed. At deposition Lemons discussed Cates's statement that she would get a ticket for kicking Hannah, "which [she] did not do." (Doc. 139 Ex. 2 at 270.) Evidence regarding Candace's and Christy's actions suggest that those women may have kicked Hannah or interfered with LaQuan's arrest. Cates has said that Lemons's legs may have hit Hannah accidentally when Cates picked her up. And Hannah admitted that he did not see who kicked him such that he could determine if the kick was deliberate. Lemons described a chaotic scene in which identifying exactly who was kicking or interfering was difficult. Who exactly kicked Hannah or interfered with LaQuan's arrest is disputed, and a reasonable jury could find that it was not Lemons. Thus, summary judgment will be denied regarding the arrest.[20]

No facts suggest that Hannah was involved in Lemons's continued detention following her arrest. The undisputed facts show that after Lemons was arrested Hannah did not interact with her or control her detention. Other officers transported Lemons to and detained her at the Third District Police Station, and she went from there to the hospital for treatment. Thereafter, Lemons was transported to the Milwaukee County Criminal Justice

---

[20] The City defendants do not contend that the prohibition of an arrest without probable cause was not clearly established by 2010, so the court need not address qualified immunity. Also, the court need not address the report of another officer stating that Lemons kicked her, too, as Lemons has stated that she did not recall kicking any officer and that kick, if it occurred, happened after Hannah had ordered Lemons arrested.

Facility, which is under the control of the Milwaukee County Sheriff rather than Hannah or the MPD. Her continued detention may have been in the hands of the DA's office and the sheriff's department, but not in the hands of Hannah. No facts suggest that after Hannah directed Lemons's arrest he had any personal involvement, facilitated, approved, condoned or turned a blind eye to her detention. Lemons has not argued in response to the summary judgment motion that Hannah was personally involved in her detention after arrest—she comments that the defendants' discussion of the length of detention is a "straw-man argument" that "ought to be ignored." (Doc. 138, at 6 n.1.) Thus, she does not persuasively refute the City's argument on this point. Summary judgment will be granted in Hannah's favor as to count IV for unlawful detention following Lemons's arrest.

C.     Individual-capacity supervisory claims continue against Hegerty and Flynn

There is no principle of automatic supervisor liability for constitutional torts. Instead, to be held liable for conduct of a subordinate, a supervisor must have been personally involved in that conduct, meaning that he or she knew about the conduct and "facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye for fear of what [he or she] might see." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988); *accord Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012). The supervisors must have acted either knowingly or with deliberate, reckless indifference. *Jones*, 856 F.2d at 992–93. A supervisor who was merely negligent or grossly negligent in failing to detect and prevent a subordinate's misconduct is not liable, because negligence is not actionable under § 1983. *Id.* at 992; *accord West by Norris v. Waymire*, 114 F.3d 646, 650 (7th Cir. 1997). Instead, the supervisor must be criminally reckless or at the least in conscious disregard

41

of known or obvious dangers. *West*, 114 F.3d at 651. The defendant must make a deliberate choice. *Id.*

The City defendants contend that the Supreme Court in *Iqbal v. Ashcroft*, 556 U.S. 662 (2009), altered the above-described concept of a supervisor's liability to require actual participation in the subordinate's malfeasance. The City defendants argue that all individual-capacity claims against Flynn and Hegerty must be dismissed because neither chief was personally involved with anything that happened in Lemons's home while Lemons was alone with Cates. But the City defendants are wrong.

*Iqbal*, a case primarily about the standards of pleading a civil case under Fed. R. Civ. P. 8, did not alter the above-described concept of supervisor liability. Although the Court stated that in a § 1983 suit the term "supervisory liability" is a misnomer, it merely was recognizing the unchallenged concept that supervisory officials cannot be liability for the conduct of their subordinates based on a respondeat-superior theory. 556 U.S. at 676–77. Iqbal had argued that a supervisor's mere knowledge of a subordinate's discrimination against prisoners sufficed, and the Court rejected that position, stating that the government official "is only liable for his or her own misconduct." *Id.* at 677. The Court confirmed, however, that a plaintiff must plead that each government-official defendant "through the official's own individual actions, has violated the Constitution," and approvingly cited *Dunlop v. Munroe*, 7 Cranch 242, 269 (1812), for the point that a federal official's liability "'will only result from his own neglect in not properly superintending the discharge' of his subordinates' duties." 556 U.S. at 676. Thus, the supervisor is not held vicariously liable for the actions of the subordinate but rather for the supervisor's own failures.

42

Here, Lemons contends that Hegerty and Flynn are liable for their own actions (or inactions) in creating or maintaining insufficient IAD investigatory procedures and their own failures in supervising or disciplining Cates's conduct, enabling Cates to sexually prey upon women he encountered on the job. No evidence suggests that Hegerty or Flynn was present at Lemons's house during the rape, intended for Cates to rape Lemons, or actually knew Cates would do so, but that is beside the point. As to IAD procedures and officer supervision and discipline, Hegerty and Flynn *were* personally involved. There is no dispute that the chiefs were responsible for IAD investigating procedures, received reports regarding pending investigations, and were the ultimate decisionmakers regarding officer discipline. And there is no dispute that Hegerty and Flynn exercised decisionmaking authority regarding Cates individually. Taking the facts in Lemons's favor, Hegerty was apprised of the SW and TC matters, yet gave Cates only a six-day suspension as discipline for the former and nothing for the latter, even in light of information in Cates's file regarding his prior violence toward Officer C. Similarly, Flynn was apprised of the TC and TG matters, yet failed to discipline Cates, even in light of information in Cates's file regarding the Officer C, SW, TC, and TG matters. Taking the facts in Lemons's favor, both chiefs allowed IAD internal investigations to end upon a DA's decision not to charge a crime, failed to consider prior unsustained conduct, failed to implement any system to monitor for patterns of illegal conduct, and caused an attitude in the MPD that sexual misconduct was not going to be treated seriously.

Hegerty and Flynn contend that most complaints against Cates were not sustained, and Hegerty stated at deposition that she did not believe she could or should discipline an officer based on unsustained complaints. But a reasonable jury could find that practice to

43

have exhibited deliberate indifference toward Lemons and other women Cates encountered. The repetitive complaints by vulnerable women and, especially, the unusual comment in two investigations that the perpetrator kept his condom on and zipped up his pants constituted smoke that evidences fire. At least by the time of TC's complaint and certainly by the time of TG's complaint, a pattern emerged: vulnerable females reporting that Cates was taking advantage or trying to take advantage of them sexually, whether by viewing their masturbation or by soliciting sex. Each incident may have provided reasons not imposing discipline—TC's mental illness, for instance. Yet Hegerty refused to consider any previous conduct from an unsustained complaint, and Flynn does not appear to have changed that policy. Lemons's expert has opined that the investigations found to be unsustained were not adequate and, as discussed below, internal investigations often were dropped if the DA did not charge a crime, which a reasonable jury (even aside from the expert's opinion) could conclude drew into question any unsustained finding. Flynn told a reporter regarding Cates that "from a management point of view an obvious pattern was overlooked." (Doc. 137, ¶ 36; Doc. 140, ¶ 77; Doc. 139 Ex. 11 at 205.) A reasonable jury could find that Hegerty and Flynn turned a blind eye to any pattern, exhibiting deliberate indifference to the well-being of future females with whom Cates came into contact in his job and that sexual assault was a foreseeable next offense.

Hegerty and Flynn contend that the sustained complaint regarding treatment of SW did not show sexual misconduct because Cates did nothing but observe—he was not personally involved in a sexual act with SW. But a jury could disagree with that position. Further, a reasonable jury could find that Hegerty did not take sexual misconduct seriously based on her testimony that she would treat a sexual proposition like "Suck my dick and

44

I'll get you out of here" made by an officer in control of prisoners as simply "a stupid off-the-cuff remark" that merited little punishment. (Doc. 140, ¶ 54; Doc. 163, ¶ 54; Doc. 139 Ex. 12 at 126–27.) Lemons has provided evidence that Hegerty discounted any sexually questionable activity unless sex actually occurred and treated sexual attacks as sex rather than acts of violence. And Flynn does not appear to have taken a stricter stand.

Hegerty and Flynn were personally responsible for IAD-investigation policies. A reasonable jury could find that under their supervision IAD investigations were routinely dropped once the DA declined to prosecute (notwithstanding the differing evidentiary standards and burdens of proof in those proceedings) and that IAD procedures failed to include any ongoing flagging or monitoring of officers who had multiple similar complaints against them, even if each alone did not result in discipline. Flynn told the reporter that "[i]f there is a pattern even of unsubstantiated allegations, we recognize it requires a closer look." (Doc. 137, ¶ 36; Doc. 140, ¶ 77; Doc. 139 Ex. 11 at 205.) Yet Hegerty and Flynn failed to make sure IAD was tracking unsustained allegations or that complaints were pursued internally after the DA chose not to charge the officer.

Also, Cates's statement to Lemons when he confronted her at the police station that no one would believe her accusation and no severe discipline would be imposed—only a suspension, then he would be back—may support a jury finding in Lemons's favor. A reasonable jury could determine that Hegerty and Flynn, as the ultimate decisionmakers regarding discipline and ultimate policymakers regarding IAD investigations and atmosphere in the MPD, were personally responsible for and deliberately indifferent about Cates's attitude such that he believed he could take advantage of vulnerable females with few to no repercussions.

45

In sum, taking the facts in Lemons's favor, Hegerty and Flynn facilitated Cates's conduct and turned a blind eye to it by not disciplining him more severely (or at all) for prior rule infractions, abdicating responsibility for discipline to the DA's office, not providing a means for recognition of patterns of prior conduct even if unsustained, and responding to complaints of sexual misconduct by Cates so inadequately that Cates felt confident that he could rape Lemons with little to no consequence. A reasonable jury could find that Hegerty's and Flynn's personal choices in IAD oversight and in previously not disciplining Cates created the circumstances in which Cates believed that his word would outweigh Lemons's and that the most discipline he would receive was a short suspension—that he would be back on the force with little trouble. Thus, summary judgment will be denied as to this theory of liability.[21]

D.    The *Monell* claim continues to trial

Although cities are "persons" for purposes of § 1983, liability against cities may not arise vicariously; municipalities cannot be held liable under § 1983 on a respondeat superior basis. *See Monell v. N.Y. Dep't of Social Servs.*, 436 U.S. 658, 691–92 (1978); *accord Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). Instead, cities are liable only for acts for which the entity itself is responsible, meaning acts the entity has embraced as policy or custom. *Monell*, 436 U.S. at 690–91, 694; *Palka v. City of Chicago*, 662 F.3d 428, 434 (7th Cir. 2011); *accord Brown*, 520 U.S. at 403. To show such responsibility, a plaintiff must show that her injury was caused by (1) enforcement of an express policy of the municipality; (2) a widespread practice so permanent and well settled to constitute a

---

[21] The City defendants do not contend that applicable law regarding the supervisors' liability was not clearly established by 2010. Thus, the court need not address qualified immunity.

46

custom or usage with the force of law; or (3) a person with final policymaking authority. *Palka*, 662 F.3d at 434. "Absent proof that the injury in question was caused by an employee with final policymaking authority or by an express policy or established custom of the municipality, there can be no liability on the part of the municipality itself." *Id.*

In addition to identifying a policy or custom, a plaintiff suing a municipality under § 1983 must also show that the municipality, through its deliberate conduct, was the moving force behind the injury alleged. *Brown*, 520 U.S. at 400, 404. Thus, a plaintiff must show, in addition to a policy or custom, that the action was taken with the requisite degree of culpability and that a direct causal link exists between the municipal action and the constitutional violation. *Id.* at 404. Further, where the municipality has not directly inflicted the injury, but instead has caused an employee to do so, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405. When a facially lawful municipal action has led an employee to violate a plaintiff's rights, the plaintiff must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences. *Id.* at 407. Deliberate indifference requires proof of disregard of a known or obvious consequence of one's action, and the deliberate indifference must be to the risk of a violation of a particular constitutional or statutory right. *Id.* at 410-11. Mere probability that an officer inadequately disciplined will inflict constitutional injury is not enough; it must be that this officer was highly likely to inflict the particular injury suffered by the plaintiff. *Id.* at 412.

A failure-to-investigate, supervise, or discipline theory can support a finding of municipal liability "because a policy of condoning abuse may embolden a municipal

47

employee and facilitate further abusive acts." *Sigle v. City of Chicago*, No. 10 C 04618, 2013 WL 1787579, *2 (N.D. Ill. Apr. 25, 2013) (internal quotation marks omitted). Again, deliberate indifference is required for liability. *Id.* In cases alleging inadequate supervision, if a program does not prevent constitutional violations, municipal decisionmakers may be put on notice that a new program is called for, and their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard of the consequences, i.e., the deliberate indifference, for municipal liability. *Brown*, 520 U.S. at 407. Similarly, a custom of failing to discipline police officers "can be shown to be deliberately indifferent if the need for further discipline is so obvious and procedures so inadequate as to be likely to result in the violation of constitutional rights such that a jury could attribute to the policymakers a deliberate indifference to the need to discipline." *Sigle*, 2013 WL 1787579 at *3 (internal quotation marks omitted). Also, a plaintiff may prove deliberate indifference by showing that the City failed to act in response to repeated complaints of constitutional violations by officers. *Id.*

Although the individual-capacity claims against Hegerty and Flynn are not identical to the *Monell* claim against the City, the claims have much in common. *See Jones*, 104 F.3d at 628. Because Hegerty and Flynn indisputably were policymakers for the MPD, all of their personal actions regarding disciplining (or not disciplining) Cates in particular, failure to track patterns of illegal conduct after unsustained findings, and failure to pursue internal discipline if the DA chose not to charge the officer can be considered regarding whether the City had a policy or custom that caused the harm to Lemons. The court can

48

consider their conduct as policymakers alone plus as just one part of an alleged practice so well settled as to constitute a custom or usage of the MPD.

In addition to Hegerty's and Flynn's conduct, Lemons has presented evidence regarding City disciplinary practices beyond just Cates and Hegerty and Flynn evidencing systemic investigative and disciplinary shortcomings. As for the de facto policy of failing to impose discipline if the DA chose not to charge, Jones stated, "when the District Attorney didn't issue, it's almost like it didn't happen. The criminal aspects did not happen, and, therefore, I could not substantiate an internal discipline even though in my mind I was sure that those, that misconduct did take place." (Doc. 139 Ex. 13 at 142.) The MPD had no program to track or monitor officers who were the subjects of repeated complaints—any potential patterns were caught happenstance by IAD administrators or by investigators when a new complaint was filed. And the evidence regarding sexual improprieties by Lelinski and Vagnini show that the failure to discipline Cates was not the sole instance of failure. The conduct of those officers, during a time preceding Cates's attack on Lemons, suggests an atmosphere in the MPD that notwithstanding official policies and criminal statutes, MPD officers could invade the bodily integrity of Milwaukee-area citizens for years with little with little to no disciplinary consequences. Again, Cates's own words provide evidence on which a reasonable jury could find in Lemons's favor regarding the *Monell* claim: no one would believe Lemons and the most he would get would be a suspension and he would be back. Thus, the City's motion for summary judgment on the *Monell* claim is denied. *See Estate of Fields v. Nawotka*, No. 03-CV-1450, 2008 WL 746704 (E.D. Wis. Mar. 18, 2008) (denying summary judgment on *Monell* claim alleging that the MPD's failure

49

to investigate officer shootings and discipline officers created a de facto policy of ratifying officer use of deadly force).

The court notes that in response to the City defendants' summary judgment motion Lemons has limited her argument to Hegerty's and Flynn's failures to supervise IAD and Cates properly and to discipline Cates and the MPD's practices of failing to meaningfully investigate or discipline. Thus, she does not deny that the court should dismiss any deliberate-indifference claim (whether against Hegerty and Flynn individually or the City under *Monell*) regarding hiring or training policies or practices, including the hiring and training of Cates.

E.    Whether Cates acted within the scope of employment is a factual question for trial

Under Wisconsin law, a state- or local-government employee sued either in an official capacity or in an individual capacity for acts committed while carrying out duties as an employee is entitled to indemnification by the public employer for damages and costs if "the jury or the court finds that the defendant was acting within the scope of employment." Wis. Stat. § 895.46(1)(a). Whether a government employee acts within the scope of employment is generally presented to a jury because it entails factual questions about an employee's intent and purpose. *S.V. v. Kratz*, No. 10-C-0919, 2012 WL 5833185, *3 (E.D. Wis. Nov. 16, 2012); *Stephenson v. Universal Metrics, Inc.*, 2001 WI App 173, ¶ 14, 247 Wis. 2d 349, ¶ 14, 633 N.W.2d 707, ¶ 14. "Scope-of-employment issues can be especially challenging in cases alleging police misconduct." *Javier v. City of Milwaukee*, 670 F.3d 823, 830 (7th Cir. 2012). Nevertheless, summary judgment may be proper on the scope-of-employment issue in certain cases when the facts are not in dispute and those facts and any reasonable inferences lead to only one result. *See Kratz*, 2012 WL

50

5833185, at *3; *Estate of Watts v. Heine*, No. 07-CV-644, 2008 WL 4058032, *4 (E.D. Wis. Aug. 26, 2008).

An employee acts within the scope of his employment when "'doing that which is warranted within the terms of his or her express or implied authority, considering the nature of the services required, the instructions which he or she has received, and the circumstances under which his or her work is being done or the services are being rendered.'" *Kratz*, 2012 WL 5833185, at *3 (quoting *Estate of Murray v. Travelers Ins. Co.*, 229 Wis. 2d 819, 825, 601 N.W.2d 661, 663 (Ct. App. 1999)). The employee must have been motivated, at least partially, by an intent to serve the employer. *Id.*; *Estate of Watts*, 2008 WL 4058032 at *3. Intent to serve the employer need not be the sole or even primary purpose; however, some intent to serve the employer must exist. *Kratz*, 2012 WL 5833185 at *3. An employee does not act within the scope of employment merely because the conduct occurred in the work setting or during working hours. *Id.* at *6. "The employee's purpose at the time of the conduct is what matters." *Id.* The inquiry involves an objective assessment of the employee's actions in light of his or her job position as well as consideration of the employee's subjective intent. *Id.* at *3. Subjective intent at the time of the conduct is key. *Id.*

An employee can act within the scope of his employment even if he acts intentionally or criminally and even if he misuses or exceeds his authority. *Javier*, 670 F.3d at 829-30, 832; *see Kratz*, 2012 WL 5833185, at *4; *Estate of Watts*, 2008 WL 4058032 at *4 (stating that actions facilitating or constituting a crime may fall within the scope of employment). Conduct that generates criminal charges is not mutually exclusive of actions within the scope of employment. *Javier*, 670 F.3d at 832. An employee may act within the

51

scope of employment if some of his actions involved performance of his job duties, even if he used improper methods to carry out those duties. *Estate of Watts*, 2008 WL 4058032 at *3. That rape is not a legitimate law enforcement goal does not prevent an officer's act of rape from falling within his scope of employment. *Bennett v. Pippin*, 74 F.3d 578, 586, 589 (5th Cir. 1996) (finding that the sheriff's actions were those of the county because he used his authority over an investigation to coerce sex with the victim, including saying that he could do what he wanted because he was the sheriff); *Kratz*, 2012 WL 5833185 at *5 (acknowledging that "[i]f the acts alleged are unclear or can be reasonably viewed as furthering a purpose other than the employee's own sexual desires, summary judgment would be inappropriate").

An employee acts outside the scope of employment when the employee's conduct is "'different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.'" *Kratz*, 2012 WL 5833185 at *4 (quoting *Olson v. Connerly*, 156 Wis. 2d 488, 497-501, 457 N.W.2d 479, 482-84 (1990)). When an employee "fully steps aside from conducting the employer's business to procure a predominantly personal benefit, the conduct falls outside the scope of employment." *Block v. Gomez*, 201 Wis. 2d 795, 806, 549 N.W.2d 783, 788 (Ct. App. 1996). An employee's knowing violation of laws, express employer policies, or disciplinary codes may indicate that the employee was acting outside the scope of employment, *Kratz*, 2012 WL 5833185 at *4, but that is not always the case.

The City contends that on the undisputed facts it has no obligation to indemnify Cates for liability because Cates stepped aside from his role as an officer when he raped Lemons. The City points to Cates's statements that he wanted to have sex with Lemons

52

to gratify his own desires. Certainly, Cates's statement that he was acting for his own sexual pleasure is weighty evidence that could cause a reasonable jury to find in the City's favor regarding scope of employment. As stated by Judge Griesbach in *Kratz*, subjective intent is important.

But at the summary judgment stage the court does not weigh the evidence, and sufficient evidence exists for a reasonable jury to find to the contrary, i.e., that Cates was acting within the scope of employment at the time of the rape. Lemons's home was Cates's workplace—he had been sent to her home in response to her 9-1-1 call. The rape occurred during Cates's work shift while Cates wore his MPD uniform and weapon. A jury could reasonably infer that Cates used his power as a police officer and possession of a weapon to gain control over Lemons. Importantly, Cates was in the middle of his investigation and asked Lemons to show him the broken windows she had reported. As a result of that request she led him to the bathroom, where he then cornered her. Further, Lemons had been in a scuffle with her neighbors; and Cates's act of subduing Lemons may be viewed as his way of exerting control over the reported situation. Intent to serve the city/employer did not have to be the sole cause of the Cates's actions; it is enough if Cates's conduct was partially actuated by that desire.

Lemons has presented more evidence than was presented by the plaintiff in *Kratz* presented. In *Kratz*, a male prosecutor made sexual advances toward a female victim via thirty text messages over a forty-eight-hour period. Judge Griesbach found no connection between the messages and an intent by the prosecutor to serve his employer's interests. While communicating with a crime victim using text messaging may have been a part of the prosecutor's duties, "sending messages to procure a sexual relationship certainly was

53

not employment-related." 2012 WL 5833185, at *5. Texting suggestive messages over a forty-eight-hour period likely included off-duty time and a less-pressured message. In contrast, Cates was at the scene of a possible crime in his role as a police officer, Cates asked Lemons to show him broken windows she had reported, and Cates was in the process of investigating when he cornered Lemons in the bathroom and raped her while on duty, wearing a police uniform and weapon.

Lemons's case is more akin to *Estate of Watts*, in which the plaintiff alleged that Heine sexually assaulted her while she was an inmate at the Milwaukee County Jail under Heine's supervision. In denying a motion to dismiss, Judge Stadtmueller stated:

> [a] reasonable trier of fact could find that Heine's sexual misconduct was not wholly disconnected from the scope of his employment. A jury could conclude that his supervision of and interaction with inmates, both inside and outside of their cells, was part of his job and the sexual assault was only made possible by virtue of his status as a deputy sheriff.

2008 WL 4058032 at *4. Here, a reasonable trier of fact could find that Cates's sexual assault of Lemons was not wholly disconnected from his job. Cates's interaction with crime victims and his investigation of crimes while responding to 9-1-1 calls was part of his job, and the sexual assault was made possible by Cates's role in the investigation. In sum, whether Cates stepped aside from serving his employer for a sexual frolic or instead raped Lemons as part of the continuum of the investigation is a question for trial. Consequently, for the reasons set forth above,

IT IS ORDERED that the City defendants' motion for summary judgment (Doc. 116) is granted as to Lemons's claims asserting unlawful detention by Hannah (part of count IV) and supervisory or *Monell* liability relating to hiring or training.

54

IT IS ORDERED that as to all other issues the City defendants' motion for summary judgment (Doc. 116) is denied.

IT IS ORDERED that an in-court hearing is set for July 18, 2016, at 1:00 p.m., regarding all pending motions in limine. The court will set a new trial date at that time.

Dated at Milwaukee, Wisconsin, this 8th day of July, 2016.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE